# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| THADDEUS RODGERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:11CV 26 SNLJ(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Thaddeus L. Rodgers for Disability Insurance Benefits under Title II of

the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause

was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the

Complaint. (Document Number 12). Defendant has filed a Brief in Support of the Answer.

(Doc. No. 16).

## Procedural History

On December 13, 2007, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on October 15, 2007. (Tr. 104-12). This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated December 22, 2009. (Tr. 56-57, 59-63, 6-

15). On February 2, 2011, the Appeals Council denied plaintiff's request for review. (Tr. 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on May 5, 2009. (Tr. 22). Plaintiff was present and was represented by counsel. (Id.). Vocational expert John Grenfell was also present. (Id.).

The ALJ noted that there were not many recent medical records. (Tr. 23). Plaintiff's attorney requested a consultative evaluation. (Id.). The ALJ indicated that he would grant plaintiff's request. (Id.).

Plaintiff's attorney made an opening statement, in which he stated that it was plaintiff's theory of the case that since October 15, 2007, plaintiff has been unable to engage in any substantial and gainful activity because of his inability to control his diabetes. (Tr. 24).

The ALJ then examined plaintiff, who testified that he was twenty-six years of age and was single. (Id.). Plaintiff stated that he lived alone in an apartment. (Id.). Plaintiff testified that he pays $29.00 a month in rent through a subsidized housing program. (Tr. 25). Plaintiff stated that he receives food stamps in the amount of $161.82 a month. (Id.). Plaintiff testified that he did not receive Medicaid benefits, and that he had no insurance. (Tr. 26).

Plaintiff stated that his mother pays his rent. (Id.). Plaintiff testified that his mother worked at a glove factory but was unemployed at the time of the hearing because the factory closed. (Id.). Plaintiff stated that his mother lives near him in Brunswick, Missouri. (Id.).

Plaintiff testified that he graduated from high school and completed one year of college.

(Tr. 27).  Plaintiff stated that he was right-hand dominant, five-feet ten-inches tall, and weighed 162 pounds.  (Id.).

Plaintiff testified that he last worked at Stanbury Uniforms, a band uniform manufacturer, as a presser.  (Tr. 29).  Plaintiff stated that he worked at this position for one year and two months.  (Id.).  Plaintiff testified that this position ended in October of 2007.  (Id.).  Plaintiff stated that on his last day of work, he had a seizure in the morning and was "in a little bit of a coma."  (Id.).  Plaintiff testified that his girlfriend called an ambulance and paramedics revived him.  (Id.).  Plaintiff stated that he was not taken to the hospital and that he felt fine after being treated by the paramedics.  (Id.).  Plaintiff testified that he missed work that day because he did not have a ride to work due to the seizure episode.  (Tr. 30).  Plaintiff stated that he has no license and typically rode to work with a friend.  (Id.).  Plaintiff testified that he was fired because that was his eleventh absence and his employer had a policy that employees with eleven absences would be terminated.  (Id.).

Plaintiff stated that he missed the other ten days due to having seizures in the morning prior to work, and having seizure "spells" while at work.  (Tr. 31).  Plaintiff testified that he became dizzy while working, and passed out, after which he was not himself.  (Id.).  Plaintiff stated that he was sometimes taken from the job site by ambulance.  (Tr. 32).  Plaintiff testified that on other occasions, his employer sent him home.  (Id.).  Plaintiff stated that his employer did not count a full day's absence if he only missed a half-day of work.  (Id.).

Plaintiff stated that when he was working, he had health insurance and was getting medication.  (Id.).  Plaintiff testified that the medication was effective.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he has been diabetic since he

was ten years of age. (Tr. 33). Plaintiff stated that he has not lost other jobs because he missed work. (Id.).

Plaintiff testified that he lost a job at Fullers Marketing Company due to seizures. (Id.). Plaintiff stated that his employer thought he was having too many seizures and that he would be a threat to himself on the job. (Id.). Plaintiff testified that he glued samples onto plaster boards and made boxes at this position. (Id.). Plaintiff stated that he worked at the position for about one year. (Id.). Plaintiff testified that he had seizures due to his diabetes when his blood sugar levels got low. (Tr. 34). Plaintiff testified that he had about five of these seizure spells when he worked at Fullers Marketing Company. (Id.). Plaintiff stated that he almost cut his fingers off when he was operating an automatic saw and he started having a seizure. (Id.). Plaintiff acknowledged that he should not have been operating a power saw due to his seizure condition. (Tr. 35).

Plaintiff testified that he had about ten seizure spells that interfered with his work while he was working at Stanbury Uniforms. (Tr. 36).

Plaintiff stated that he was not seeing Dr. Ian Fawks, his primary care physician, at the time of the hearing because he had outstanding medical bills. (Tr. 37).

The ALJ re-examined plaintiff, who testified that he owed Dr. Fawks over a hundred dollars. (Id.). Plaintiff stated that he has applied for Medicaid benefits twice and was denied both times. (Id.).

Plaintiff testified that his attorney told him about a place where he may be able to receive medical care. (Tr. 38). Plaintiff stated that he will probably go to this place because he has not seen a doctor in a long time. (Id.). The ALJ instructed plaintiff to let his attorney know if he receives medical care so that his attorney could submit the report to the ALJ. (Tr. 39).

Plaintiff's attorney re-examined plaintiff, who testified that he had problems reading when he was in school. (Tr. 39). Plaintiff stated that he is able to read but "not like expert read." (Id.). Plaintiff testified that he is able to read the newspaper, although he does not do so on a regular basis. (Id.).

Plaintiff stated that he was paid minimum wage at the uniform factory. (Tr. 40). Plaintiff testified that he was terminated from this position. (Id.).

Plaintiff stated that his mother pays for his insulin. (Id.). Plaintiff testified that he is able to buy insulin at Wal-Mart without a prescription. (Id.). Plaintiff stated that the insulin costs $50.00 a month, and the needles cost $13.00 a month. (Tr. 41).

The ALJ questioned plaintiff, who testified that he has told his doctor that he is trying to get disability and that he cannot pay for medical care. (Id.). Plaintiff stated that his doctor still will not see him unless he pays his balance. (Id.).

Plaintiff's attorney questioned plaintiff, who testified that he has a "reaction" during which he is real sleepy, or has a seizure, about once a month. (Tr. 42). Plaintiff stated that his doctors have told him that he will die if he does not control his reactions. (Id.). Plaintiff testified that a reaction usually lasts about ten minutes. (Id.).

Plaintiff described a "seizure" as becoming dizzy, being unable to speak properly, and becoming hot and sweating. (Id.). Plaintiff testified that he tries to consume something sugary when he has a seizure. (Tr. 43). Plaintiff stated that he eats peanut butter and crackers or a sugary food, after which he starts feeling better. (Id.). Plaintiff testified that it usually takes about five to ten minutes to get over a seizure. (Id.). Plaintiff stated that he is unable to go back to work full speed after having a seizure. (Id.).

Plaintiff testified that, when he had seizures while working at the uniform factory, his employer told him to sit in the break room until he could continue working. (Tr. 44). Plaintiff stated that if he was unable to resume working, they would send him home. (Id.). Plaintiff testified that he usually sat in the break room for about one hour. (Id.).

Plaintiff stated that he has not seen his doctor since September 2007. (Id.). Plaintiff testified that he has been unable to check his blood sugar levels. (Id.).

The ALJ indicated that he did not have questions for the vocational expert at that time, although he might serve interrogatories on him in the future. (Id.). The ALJ stated that he was placing the case in post-development status, and that he would request a consultative physical evaluation. (Tr. 45). The ALJ requested that plaintiff's attorney submit the attendance records from plaintiff's last employer. (Id.). The ALJ granted plaintiff forty-five days in which to submit additional evidence. (Id.).

## B. Post-Hearing Evidence

On September 12, 2009, the ALJ served interrogatories upon vocational expert John Grenfell. (Tr. 247-50). The ALJ first asked Mr. Grenfell to assume a hypothetical claimant who was capable of lifting ten pounds frequently and twenty pounds occasionally; sitting six hours in an eight-hour work day; standing six hours in an eight-hour work day; walking six hours in an eight-hour workday; occasionally engaging in postural activities such as stooping, crawling and crouching; unable to work at unprotected heights or be exposed to hazardous machinery and tools; and unable to operate motor vehicles. (Tr. 249). The ALJ next asked Mr. Grenfell to assume the same limitations as the previous hypothetical, but with the additional limitations of no more than unskilled work, and the individual would likely miss ten to twelve days a year due to

hypoglycemic episodes. (Id.).

Mr. Grenfell responded on October 29, 2009. (Tr. 252-54). In response to the ALJ's first hypothetical, Mr. Grenfell stated that the hypothetical claimant would be capable of performing plaintiff's past work of "carry out." (Tr. 253). Mr. Grenfell stated that the hypothetical claimant would also be capable of performing other work, such as office helper (2,000,000 positions nationally, 20,000 positions in Missouri); mail clerk (160,000 positions nationally, 1500 positions in Missouri); and counter clerk (400,000 positions nationally, 4000 positions in Missouri). (Id.).

With regard to the ALJ's second hypothetical, Mr. Grenfell stated that the claimant would be capable of performing plaintiff's past work as "carry out," and the other jobs he listed in response to the first hypothetical if he missed one day a month. (Id.).

The ALJ proffered the interrogatories and Mr. Grenfell's answers to plaintiff's counsel on November 4, 2009. (Tr. 260-01).

## C. Relevant Medical Records

The record reveals that plaintiff arrived at the emergency room of Pershing Memorial Hospital by ambulance on December 28, 2005, with complaints of low blood sugar. (Tr. 289). The examining physician noted that plaintiff was well known to him, having treated several episodes previously. (Id.). It was noted that plaintiff admitted to taking insulin but not eating, and that plaintiff was cautioned that he could not take insulin and not eat. (Id.). Plaintiff was diagnosed with uncontrolled diabetes with hypoglycemia.[1] (Tr. 290).

---

[1]Symptoms resulting from low blood glucose, which are either autonomic or neuroglycopenic. Autonomic symptoms include sweating, trembling, feelings of warmth, anxiety, and nausea. Neuroglycopenic symptoms include feelings of dizziness, confusion, tiredness, difficulty speaking, headache, and inability to concentrate. Stedman's Medical Dictionary, 933

Plaintiff saw Ian Fawks, D.O. on January 3, 2007, for medication refills. (Tr. 300). Dr. Fawks' impression was diabetes mellitus I.[2] (Id.).

Plaintiff saw Dr. Fawks on July 2, 2007, for a follow-up regarding his diabetes. (Tr. 299). Dr. Fawks found that plaintiff was "doing really well," and noted that he was on insulin. (Id.).

Plaintiff presented to the emergency room on September 14, 2007, with complaints of low blood sugar. (Tr. 279). Plaintiff reported that he had overslept and did not eat breakfast. (Id.). The examining nurse spoke with plaintiff about "his uncontrolled diabetes," and informed him "about what could happen to him if he did not try to keep a better watch on his blood sugars." (Tr. 280). It was noted that plaintiff had a history of diabetes mellitus that was not controlled due to non-compliance. (Tr. 281). The examining physician diagnosed plaintiff with hypoglycemia and uncontrolled diabetes mellitus. (Tr. 282).

Plaintiff arrived at the emergency room by ambulance on September 19, 2007, after his girlfriend found him in a car unresponsive. (Tr. 270). The examining physician noted that plaintiff was "well known" to him, having been seen in the emergency room on numerous occasions. (Id.). Plaintiff was diagnosed with hypoglycemia secondary to excess insulin. (Tr. 271). Plaintiff was instructed on proper diet and use of insulin. (Id.).

Plaintiff presented to Elizabeth A. Geden, FNP, at Family Health Center of Boone County, on May 19, 2009. (Tr. 334-36). Plaintiff reported diabetes since 1996. (Tr. 334). Ms. Geden indicated that plaintiff was compliant with his medication and that plaintiff reported no complications.

_____

(28th Ed. 2006).

[2]A condition characterized by high blood glucose levels caused by a total lack of insulin. Occurs when the body's immune system attacks the insulin-producing beta cells in the pancreas and destroys them. The pancreas then produces little or no insulin. Type I diabetes develops most often in young people but can appear in adults. Stedman's at 530.

(Tr. 336). Ms. Geden's assessment was uncontrolled type I diabetes. (Id.).

Plaintiff saw Edna C. DeCastro, M.D. on June 15, 2009, for a consultative examination. (Tr. 322-24). Plaintiff reported insulin-dependent diabetes and a history of multiple hypoglycemic episodes. (Tr. 322). Plaintiff indicated that he did not follow any particular diabetic diet, but he does watch what he eats. (Id.). Plaintiff stated that he checked his blood sugar levels three times a day and that they ranged from 150 to 170. (Id.). Plaintiff reported fluctuating blood sugars that were worse when he performed strenuous activity such as basketball. (Id.). Plaintiff indicated that when his sugars are low, he has symptoms of blurry vision, sweatiness, and decreased communication skills. (Id.). Plaintiff also complained of knee pain due to twisting his knee while playing basketball. (Id.). Upon physical exam, Dr. DeCastro found no retinopathy[3] or peripheral neuropathy.[4] (Tr. 324). Dr. DeCastro diagnosed plaintiff with left knee pain/inflammation and insulin-dependent diabetes. (Id.). Dr. DeCastro noted that plaintiff has symptomatic hypoglycemic episodes that were worse with activity. (Id.). Dr. DeCastro stated that "[t]his can easily be cared for with a change in his insulin regimen so that hypoglycemic episodes can be avoided." (Id.).

Dr. DeCastro also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Tr. 325-331). Dr. DeCastro expressed the opinion that plaintiff could continuously lift and carry up to twenty pounds, frequently lift up to fifty pounds, and occasionally lift up to one hundred pounds. (Tr. 325). Dr. DeCastro found that plaintiff could sit for eight hours, stand for six hours, and walk for four hours in an eight-hour workday. (Tr. 326). Dr. DeCastro

_____

[3]Diabetic retinopathy is retinal changes occurring in diabetes mellitus. See Stedman's at 1685.

[4]Disorder of the peripheral nerves causing hypesthesia, hyperesthesia, paresthesia, or loss of temperature and vibratory sense. See Stedman's at 1313.

indicated that plaintiff could only occasionally stoop, kneel, crouch, and crawl due to his right knee swelling. (Tr. 328). Dr. DeCastro found that plaintiff had no other limitations. (Id.).

Plaintiff saw Sandra Clarkson, FNP, at Family Health Center of Boone County on November 18, 2009, with complaints of diabetes and numbness in his right index finger. (Tr. 342). Ms. Clarkson diagnosed plaintiff with diabetes mellitus without mention of complication. (Tr. 344). Ms. Clarkson indicated that plaintiff had the skills to manage his diabetes care. (Id.). Plaintiff was continued on the current dosage of insulin. (Id.). Ms. Clarkson indicated that plaintiff's finger numbness could possibly be diabetic neuropathy[5] and that she would refer him for further study if the numbness continued. (Id.).

Plaintiff saw Ms. Clarkson on May 18, 2010, for follow-up regarding his diabetes. (Tr. 348). Ms. Clarkson noted that plaintiff had been managed with insulin and that he had no associated symptoms. (Id.). Plaintiff denied any tingling or pain in his hands. (Tr. 350). Plaintiff indicated that he was seeking employment. (Id.). Plaintiff had some normal blood sugar readings the prior month and some higher than 160. (Id.). Ms. Clarkson diagnosed plaintiff with uncontrolled type I diabetes. (Id.). Ms. Clarkson instructed plaintiff to try to eat more fresh fruits and vegetables. (Id.).

**The ALJ's Determination**

The ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

_____

[5]A generic term for any diabetes mellitus-related disorder of the peripheral nervous system, autonomic nervous system, and some cranial nerves. See Stedman's at 1313.

2.  The claimant has not engaged in substantial gainful activity since October 15, 2007, the alleged onset date (20 CFR 404.1571, *et seq.*, and 416.971, *et seq.*).

3.  The claimant has the following severe impairments: diabetes mellitus and a seizure disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: more than occasionally stooping, kneeling, crouching, and crawling; working at unprotected heights; working with or around hazardous machinery; and operating automotive equipment.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on June 24, 1982 and was 25 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11-15).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed

on December 13, 2007, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on December 13, 2007, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 15).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

### B.      The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful

- 12 -

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.

See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.    Plaintiff's Claim

In his sole argument, plaintiff contends that the ALJ erred in finding that plaintiff was capable of performing light work absent medical noncompliance because the ALJ did not comply with Social Security Ruling ("SSR") 82-59.  Defendant contends that SSR 82-59 does not apply in this case because the ALJ's consideration of plaintiff's noncompliance occurred in connection with his analysis of medical evidence and in determining whether plaintiff's absences from work were credible. Defendant argues in the alternative that, even if SSR 82-59 did apply in this case, the ALJ made findings sufficient to comply with that Ruling.

Social Security Ruling 82-59 "explains the circumstances in which the Secretary may deny benefits to an otherwise disabled individual on the basis that the claimant has failed to follow...prescribed treatment" and "only applies to claimants who would otherwise be disabled within

the meaning of the Act." Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). It does not

apply when an ALJ discusses evidence of noncompliance for the purpose of assessing the claimant's

credibility or the weight to be given to medical opinions. See Holley, 253 F.3d at 1092; Owen v.

Astrue, 551 F.3d 792, 800 (8th Cir. 2008).

Social Security Ruling 82-59 provides in relevant part:

An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work cannot by virtue of such "failure" be found to be under a disability.

Identifying "Failure" as an Issue

SSA may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:
    1. The evidence establishes that the individual's impairment precluded engaging in any substantial gainful activity (SGA)...; and
    2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
    3. Treatment which is clearly expected to restore capacity to engage in an SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
    4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

Where SSA makes a determination of "failure," a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable.

S.S.R. 82-59, 1982 WL 31384, 1975-1982 Soc. Sec. Rep. Serv. 793, 793 (1982). Before a

finding of noncompliance can be made, however, SSR 82-59 requires that an ALJ provide the

claimant with: (1) notice of the effect of noncompliance on the claimant's application for benefits;

(2) opportunity to show justifiable cause for failing to undergo the prescribed treatment; and (3)

opportunity to undergo the prescribed treatment. Id.

In this case, the ALJ discussed plaintiff's noncompliance in assessing the credibility of

plaintiff's complaints and in determining plaintiff's residual functional capacity. (Tr. 13). The

ALJ began his analysis by stating "[t]he treatment notes indicate at best, ailments that appear troublesome, but do not impose limitations of such significance as to preclude sustained competitive employment." (Id.). The ALJ pointed out that none of plaintiff's treating physicians have ever recommended that plaintiff not seek employment, nor is there any evidence that plaintiff has required surgery or prolonged hospitalization. (Id.). The ALJ stated that "[i]n fact, the record shows that his diabetic symptomology is directly related to his noncompliance with his medication and diet regimen." (Id.). As support for this finding, the ALJ cited emergency room records from 2005 noting that plaintiff had been warned in the past that he could not take insulin without eating. (Tr. 13, 289-90). The ALJ also noted that Dr. DeCastro reported that plaintiff's symptomatic hypoglycemic episodes could "easily be cared for with a change in his insulin regimen." (Tr. 13, 324). The ALJ then stated that plaintiff's "purported seizure episodes appear to be the result of his diabetic condition and medication and diet noncompliance as there does not seem to be evidence in the record to the contrary." (Tr. 13). The ALJ concluded that "the above residual functional capacity assessment is supported by the treatment notes of the claimant's physician[]s, the claimant's own testimony, and the record as a whole." (Id.).

After assessing plaintiff's credibility and determining plaintiff's residual functional capacity, the ALJ noted that plaintiff's attorney proposed that the vocational expert be asked if plaintiff's impairments caused 20.16 absences from work per year, would there still be a significant number of jobs in the economy that plaintiff could perform. (Id.). The ALJ stated:

> However, the undersigned finds that this additional inquiry is not necessary, in that if the claimant's impairments were found to be of such severity to cause this level of absenteeism, a fully favorable decision would have been rendered. The evidence supports the conclusion that with diet and medication compliance, the claimant's absenteeism rate would be more in line with the average individual in the work force. Medical noncompliance is a key factor in the extent and frequency of the claimant's symptoms.

(Id.).

The undersigned finds that the ALJ properly considered plaintiff's noncompliance with prescribed treatment in analyzing the medical evidence and in determining the credibility of plaintiff's subjective complaints. Plaintiff contends that the ALJ erred in failing to follow any of the requirements of SSR 82-59. "Social Security 82-59 only applies to claimants who would otherwise be disabled within the meaning of the [Social Security] Act; it does not restrict the use of evidence of noncompliance for the disability hearing." Holley, 253 F.3d at 1092. The Ruling "does not restrict the use of evidence of noncompliance; it merely delineates the reasons that the Social Security Administration may deny benefits to an otherwise disabled person because they fail to comply with their doctor's prescribed treatment." Id.

In Holley, the ALJ "analyzed the evidence of [the claimant's] noncompliance within the context of his analysis of [the claimant's] credibility. The ALJ never determined that [the claimant] was disabled and that compliance would restore his ability to work." Id. "By contrast, the ALJ determined that in spite of [the claimant's] noncompliance, he was not disabled. The ALJ used the evidence of [the claimant's] noncompliance solely to weigh the credibility of [his] subjective claims of pain...Therefore, Social Security Ruling 82-59 does not apply to this case." Id.

In this case, as in Holley, the ALJ did not find that plaintiff was disabled and that compliance would restore his ability to work. The ALJ specifically stated that the record "fails to support allegations of a severe and debilitating impairment or combination of impairments." (Tr. 13). The ALJ continued that "the treatment notes indicate at best, ailments that appear troublesome, but do not impose limitations of such significance as to preclude sustained

competitive employment." (Id.). The ALJ then proceeded with his discussion of plaintiff's credibility and residual functional capacity as discussed above.

Plaintiff focuses on the ALJ's statements that, if plaintiff's impairments caused over twenty absences per work year, then a fully favorable decision would have been rendered. (Tr. 13). The ALJ noted that the evidence reveals that, with diet and medication compliance, plaintiff's absenteeism rate would be more in line with the average individual in the work force. (Id.). While the ALJ admittedly could have been more explicit, he was simply indicating that plaintiff's absences from work were not credible. The ALJ specifically stated, "*if the claimant's impairments were found to be of such severity to cause this level of absenteeism*, a fully favorable decision would have been rendered." (Id.) (emphasis added). The ALJ, however, found that this level of absenteeism was *not* credible for the reasons he discussed in his credibility analysis.

The ALJ properly discussed plaintiff's noncompliance with medical treatment in determining plaintiffs' credibility. "It is for the ALJ in the first instance to determine [the claimant's] motivation for failing to follow prescribed treatment or seek medical attention." Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). The ALJ noted plaintiff's history of noncompliance with treatment recommendations as reflected in emergency room records from 2005 and 2007. (Tr. 13). These emergency room records are replete with references to noncompliance. On December 28, 2005, it was noted that plaintiff was well-known to the examining physician and that he was cautioned that he could not take insulin and not eat. (Tr. 290). On September 14, 2007, plaintiff admitted that he had not eaten breakfast. (Tr. 279). Plaintiff was instructed to "try to keep a better watch on his blood sugars." (Tr. 280). It was noted that plaintiff had a history of diabetes that was "not controlled due to noncompliance." (Tr.

- 18 -

281). On September 19, 2007, it was again noted that plaintiff was "well known" to the examining physician, and that plaintiff was instructed on proper diet and use of insulin. (Tr. 271). As such, the ALJ's finding that plaintiff's symptoms were due, in part, to his lack of compliance with treatment recommendations is supported by substantial evidence. The ALJ did not deduce this on his own; rather, some of plaintiff's treatment notes specifically state that plaintiff's symptoms were caused by noncompliance.

Plaintiff suggests that his noncompliance was justifiable due to his inability to afford treatment. Although an inability to pay may justify a claimant's failure to seek medical care, a claimant must present evidence that her failure to seek treatment was due to the expense. See, e.g. Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (ALJ appropriately discounted claimant's argument he could not afford medical care absent evidence he sought and was denied low-cost or free care); Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989) (although lack of funds may sometimes justify failure to seek medical care, there was no evidence plaintiff had told his physicians he could not afford the prescription at issue and was denied the medication).

Plaintiff's argument that his noncompliance resulted from an inability to afford treatment lacks merit. The ALJ found that plaintiff was noncompliant in failing to follow his prescribed medication and diet regimen, not in failing to undergo treatment. Plaintiff did not allege that he was unable to pay for his insulin. Rather, he testified at the hearing that he was able to purchase insulin without a prescription, and that his mother paid for the insulin and needles. (Tr. 40, 41). Plaintiff was noncompliant in that he did not follow his physicians' instructions regarding proper diet and use of his insulin. Plaintiff's finances did not cause this noncompliance.

Plaintiff did testify at the hearing that his treating physician would not see him because he

was unable to pay for services. (Tr. 37, 41). Plaintiff, however, did not argue that he sought and

was denied low-cost or free care. In fact, plaintiff testified at the hearing that his attorney had

told him about a clinic where he could receive medical care, but he had not yet presented to this

clinic. (Tr. 38). Plaintiff evidently was able to receive medical care as the record reveals that he

received treatment from a nurse practitioner after the hearing. (Tr. 334-36, 342-44, 348-50).

Social Security Ruling 82-59 does not apply in this case because the ALJ did not

determine that plaintiff was disabled and that compliance would restore his ability to work.

Rather, the ALJ used evidence of plaintiff's noncompliance in weighing plaintiff's credibility. The

ALJ specifically found that plaintiff's claim that he missed over twenty days of work due to

symptoms of his impairments was not credible. The ALJ concluded that, despite plaintiff's

noncompliance, he was not disabled. Rather, the ALJ found that plaintiff's impairments were "at

best...troublesome." (Tr. 13). The objective medical evidence supports this determination. While

the ALJ admittedly could have delineated his findings more clearly, this deficiency in opinion-

writing does not require reversal and remand when that deficiency had no bearing on the

outcome. See Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008).

Plaintiff does not challenge the ALJ's residual functional capacity determination. The ALJ

made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) and 416.967(b) except: more than occasionally stooping, kneeling,
> crouching, and crawling; working at unprotected heights; working with or around
> hazardous machinery; and operating automotive equipment

(Tr. 11).

Determination of residual functional capacity is a medical question and at least "some

medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The undersigned finds that the ALJ's residual functional capacity determination is supported by substantial evidence. The ALJ properly found that plaintiff's subjective complaints were not credible. (Tr. 13). The ALJ pointed out that none of plaintiff's treating physicians have ever recommended that plaintiff not seek employment. (Id.). The emergency room physicians and nurses who have treated plaintiff have indicated that plaintiff's diabetic symptomology can be controlled through compliance with his medication and diet regimen. The consulting physician, Dr. DeCastro, found that plaintiff could continuously lift and carry up to twenty pounds, frequently lift up to fifty pounds, and occasionally lift up to one hundred pounds; sit for eight hours, stand for six hours, and walk for four hours in an eight-hour workday; and occasionally stoop, kneel, crouch, and crawl. (Tr. 325-328). Dr. DeCastro further found that plaintiff's hypoglycemic episodes could "easily be cared for with a change in his insulin regimen so that hypoglycemic episodes can be avoided." (Id.). As such, the residual functional capacity

formulated by the ALJ is consistent with the record as a whole, including the objective medical evidence.

The ALJ sent interrogatories to a vocational expert, which included limitations consistent with the ALJ's residual functional capacity determination in a hypothetical question. (Tr. 249). The vocational expert testified that the hypothetical individual could perform other work existing in significant numbers in the national economy, such as office helper, mail clerk, and counter clerk. (Tr. 252-54). "A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." Hulsey v. Astrue, 622 F.3d 917, 922 (8th Cir. 2010). The hypothetical question posed to the vocational expert contained all of plaintiff's credible limitations. Thus, the vocational expert's testimony in response to the ALJ's properly formulated hypothetical constituted substantial evidence that plaintiff was not disabled.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff benefits be affirmed.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and

Supplemental Security Income under Title XVI be **affirmed**.


The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


Dated this   23rd  day of January, 2012.


LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE